STATE OF CONNECTICUT *v.* JOSE G.[1]
(AC 24785)

Flynn, C. J., and Schaller and McLachlan, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued October 11, 2006—officially released July 31, 2007

*Daniel J. Krisch*, special public defender, with whom were *Michael S. Taylor* and, on the brief, *Clarisse N. Thomas*, legal intern, for the appellant (defendant).

*Proloy K. Das*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Michael A. Colombo, Jr.*, former deputy assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Jose G., appeals from the judgment of conviction, following a jury trial, of kidnapping in the second degree in violation of General Statutes § 53a-94, attempt to commit sexual assault in the first degree in violation of General Statutes § 53a-49 and § 53a-70 (a) (1), intimidating a witness in violation of General Statutes § 53a-151a and assault in the third degree in violation of General Statutes § 53a-61 (a) (1) in connection with a domestic incident involving his then girlfriend, who was more than four months pregnant at the time.[2] On appeal, the defendant claims that (1) the trial court improperly admitted into evidence certain testimony from two witnesses regarding alleged incidents of uncharged sexual abuse he perpetrated against the victim and (2) the state engaged in a pattern of prosecutorial impropriety,[3] which denied him a fair trial. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of the defendant's claims on

[2] The defendant received a total effective sentence of fifteen years imprisonment, execution suspended after seven years, with ten years probation. He was found not guilty of tampering with a witness in violation of General Statutes § 53a-151.

[3] Subsequent to oral argument in this court, our Supreme Court rendered its decision in *State v. Fauci*, 282 Conn. 23, 917 A.2d 978 (2007), in which it determined that the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct." Id., 26 n.2. Although the parties briefed and argued the defendant's claim under the more traditional nomenclature, we have adopted the term prosecutorial impropriety in our analysis of the defendant's claim.

appeal. In the very early morning hours of March 6, 2002, police officers on patrol noticed a commotion occurring in the front seat of the defendant's van at an intersection. As the van turned in front of the officers, the passenger, who was the victim, opened the door, and it appeared that she was trying to jump out of the van and flag down the officers, but she was being held back by the defendant, who was driving the van. The police pulled over the van, and the victim stated that the defendant had assaulted her. The victim was brought to the police station where she signed a voluntary, sworn statement that contained allegations that the defendant had forced her into the van and had proceeded to kiss her very hard and put his hand down her pants, digitally penetrating her vagina with his finger against her will, while instructing her not to yell. According to the statement, the defendant also struck the victim in the face approximately three times and threatened to kill her. The statement contained accusations that the defendant had hit the victim on two prior occasions and had physically, mentally and sexually abused her previously. After completing the statement, the victim was taken to Stamford Hospital, where she was examined.

At trial, the victim recanted the sworn statements she had made to the police on March 6, 2002, testifying, inter alia, that on the night of the incident, the defendant had not threatened her, restrained her or digitally penetrated her, and she denied that he had abused her in the past. When confronted with her prior sworn statement, the victim indicated that she disagreed with some of its contents. The prior statement was admitted into evidence substantively at trial pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986),[4] and

---

[4] In *Whelan*, our Supreme Court adopted "a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." *State* v. *Whelan*, supra, 200 Conn. 753.

a redacted version was read into evidence by the court clerk during the victim's testimony.

## I

The defendant first claims that the court improperly admitted certain testimony from two witnesses regarding alleged incidents of uncharged sexual abuse he perpetrated against the victim. These two state's witnesses were J, a friend of the victim who picked her up from the police station on the night of the incident, and Stamford police Officer Sandra Conetta, who had contact with the victim on the night of the incident. J testified that the victim told her about two prior incidents when the defendant had sex with the victim against her will; the first occurred in October or November, 2001, and the second occurred approximately two weeks prior to the March 6, 2002 incident. Conetta testified that on the way back from the hospital on March 6, 2002, the victim told her about the second incident, stating that the defendant had broken into her house and forced himself on her sexually on that occasion.

In his main appellate brief, the defendant claims that the court improperly admitted the testimony of J and Conetta as constancy of accusation testimony.[5] In the state's brief, it argues that this claim is not reviewable because the record is clear that the court admitted the testimony for impeachment and not as constancy of accusation testimony. In his reply brief, the defendant concedes that the court admitted the testimony for impeachment purposes, but he argues, nonetheless,

---

[5] The defendant argues that the admission of constancy of accusation testimony is limited to allegations related to the charged offenses and that allegations of prior uncharged misconduct do not fall within the ambit of the rule. See Conn. Code Evid. § 6-11 (c); *State* v. *Ouellette*, 190 Conn. 84, 100, 459 A.2d 1005 (1983) ("the [constancy of accusation] exception applies only to testimony of witnesses to whom the victim complains *concerning the act charged*" [emphasis added]).

that it still was admitted improperly because it constituted extrinsic evidence on a collateral issue and was more prejudicial than probative.

On the issue of reviewability, the defendant argues that he did not have the opportunity to respond to the issue of impeachment until the court issued an articulation in January, 2006, after his main appellate brief was filed. The state argues that the defendant did not preserve the issue at trial and that his attempts to raise this issue for the first time in his reply brief are improper, and, as such, we should not review his claim.

During the state's direct examination of J, the defendant objected, solely on the ground that the question was leading, when the state sought to elicit testimony regarding statements the victim had made to her about prior sexual abuse. The state argued that the evidence was admissible as constancy of accusation testimony. After a voir dire examination of J, the court allowed the testimony.[6]

---

[6] After the objection and brief argument, the jury was excused, and the following occurred:

"The Court: All right, voir dire. Constancy of accusation.

"[The Prosecutor]: Yes.

"The Court: As you know as a prosecutor . . . after a victim testifies concerning a specific act of . . . sexual assault, other people to whom she had complained about the sexual assault are allowed to testify. They're allowed to testify as to what she said about who attacked her and when the attack occurred.

"[The Prosecutor]: Yes.

"The Court: But that's it.

"[The Prosecutor]: Okay.

"The Court: Not a description of the occurrence.

"[The Prosecutor]: All right.

"The Court: And the reason I'm allowing it is because the last police officer stated in his testimony that the victim had complained to him about a sexual assault and that he referred it to the Norwalk police department.

"[The Prosecutor]: Right.

"[Defense Counsel]: Actually, Judge, that was the same incident. That's not a different incident.

"[The Prosecutor]: I'm not sure if it's the same incident or not. If I could voir dire with the witness, we'll find out.

On May 9, 2005, the defendant filed a motion for articulation, requesting that the court articulate the basis for admitting the challenged testimony, as well as other evidence including expert testimony related to battered woman's syndrome, which the state had proffered at trial.[7] The court denied that motion, and, on June 2, 2005, the defendant filed a motion for review with this court. On July 19, 2005, we granted the motion for review as to the ruling admitting expert testimony but denied it as to the other requests.

On September 22, 2005, the defendant filed a request pursuant to Practice Book § 64-1, seeking a signed transcript or memorandum of decision from the trial court with respect, inter alia, to the court's ruling to admit evidence related to claims of uncharged misconduct against him. The defendant submitted his main appellate brief to this court on November 21, 2005. On Janu-

---

"The Court: Pardon me, let's find out.

"[The Prosecutor]: Okay.

"The Court: Yes, that's why I'm going to have a voir dire.

"[The Prosecutor]: Thank you, Judge.

"[Defense Counsel]: But the relationship—

"The Court: The jury is not present.

"[Defense Counsel]: Okay."

At this point, a voir dire examination of J ensued. At the end of the voir dire but prior to the return of the jury, the following occurred:

"The Court: All right, but she cannot go into any specific indications, just that he forced her to have sex; that's what she told [J] on the two occasions.

"[The Prosecutor]: On the two occasions.

"The Court: One was in 2001, and one was three weeks or so before the Stamford Hospital visit?

"[The Prosecutor]: Yes.

"The Court: All right. Your objection is noted, if you wish.

"[Defense Counsel]: Yes, please. Thank you.

"The Court: All right. Invite the jury in, please. *The reason I'm allowing this in is because of this claim that the testimony she gave here in court ought to be disbelieved because of the statement she made earlier.*

"[The Prosecutor]: Yes, Your Honor." (Emphasis added.)

[7] The state presented testimony of an expert on violence against women, Evan Stark, who testified, inter alia, that it is quite common where battering is involved that victims of abuse will recant statements that they had made in the excitation of the moment of abuse.

ary 3, 2006, the trial court issued a memorandum of decision on the admission of evidence related to claims of uncharged misconduct against the defendant. In that decision, the court indicated that the evidence was admitted as impeachment evidence of the victim's trial testimony.[8] The state filed its appellate brief on May 10, 2006.

At oral argument before this court, the state argued that the reasoning for the trial court's ruling was not ambiguous and that the defendant should have briefed the impeachment issue in his main appellate brief. Without abandoning its position that the claim is not reviewable, the state requested permission to present a full written brief on the substantive merits of the issue. On January 16, 2007, we granted the state's request to file a supplemental brief, which the state filed on January 31, 2007.

"It is a well established principle that arguments cannot be raised for the first time in a reply brief. . . . Claims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *State* v. *Howard F.*, 86 Conn. App. 702, 708, 862 A.2d 331 (2004), cert. denied, 273 Conn. 924, 871 A.2d 1032 (2005).

Moreover, "[t]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is

___

[8] As the court stated, "[b]ecause the trial testimony and the *Whelan* statement were in such total conflict, and because the jury had to decide which version or portions of which version to credit, the state was permitted to introduce additional evidence of out-of-court statements allegedly made by the victim in order to impeach her trial testimony."

well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 408 n.18, 902 A.2d 1044 (2006).

Here, the defendant's argument in his reply brief presents an entirely new claim of error, which the trial court had no opportunity to address at trial. Moreover, the defendant's general objections at trial were inadequate to preserve the issue properly for appellate review.[9] Furthermore, in seeking our review of his claim, the defendant failed to request review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. "[W]here a defendant fails to seek review of an unpreserved claim under either *Golding* or the plain error doctrine, this court will not examine such a claim." (Internal quotation marks omitted.) *State* v.

---

[9] When the state first sought to elicit testimony from J as to whether the victim had confided in J regarding prior sexual abuse, defense counsel objected as "totally leading." Despite the defendant's argument on appeal, the defendant never claimed that the evidence related to a collateral matter or was inadmissible as overly prejudicial.

*Spillane*, 69 Conn. App. 336, 342, 793 A.2d 1228 (2002). Accordingly, we decline to review this claim on appeal.[10]

## II

The defendant next claims that the prosecutor engaged in a pattern of severe impropriety that deprived him of a fair trial by "improper[ly] appeal[ing] to jury sympathy, vouching for the credibility of witnesses, and deliberately violating orders of the trial court . . . ." The defendant also argues that the state improperly

[10] We disagree with the dissent's conclusion that the circumstances in the present case warrant a departure from the well established rule in our appellate courts limiting review of purely evidentiary claims to the grounds on which they were raised before the trial court. In reviewing the claim, the dissent seeks to carve out an exception to this well established rule. Moreover, the dissent's conclusion that at trial, the court "admitted the challenged testimony into evidence as constancy of accusation" fails to consider the whole record. During J's voir dire testimony, the court indicated: "Counsel, *if* this is for constancy of accusation, there is a limit set by the Supreme Court." (Emphasis added.) This appears to indicate skepticism on the part of the court as to the applicability of the proffered grounds. The notion that the court admitted the evidence only for impeachment is bolstered by the court's concluding remarks in which the court indicated: "And the reason I'm allowing it is because the last police officer stated in his testimony that the victim had complained to him about a sexual assault and that he referred it to the Norwalk police department."

In concluding that the court admitted the challenged evidence as constancy of accusation testimony, the dissent cites the court's ruling that the witness "cannot go into any specific indications, just that he forced her to have sex; that's what she told [J] on two occasions." That the court limited the impeachment testimony by precluding the witnesses from providing the victim's detailed description of the occurrence, however, was proper in the context of impeachment, as the court always may limit impeachment testimony in light of prejudice concerns. See, e.g., *State* v. *Vitale*, 76 Conn. App. 1, 9, 818 A.2d 134 ("Where the defendant admits to prior convictions on direct examination, the customary impeachment inquiry on cross-examination is limited to the name of the crime and the date of conviction . . . . The facts underlying the prior conviction are generally inadmissible . . . because they must be excluded where their prejudicial tendency outweighs their probative value." [Internal quotation marks omitted.]), cert. denied, 264 Conn. 906, 826 A.2d 178 (2003). Thus, the dissent's conclusion that the defendant had no basis to object on impeachment grounds at trial is without merit.

asked the jury to consider the negative effects of a not guilty verdict on the victim and on society in general. The state concedes that the prosecutor made an improper statement concerning what the jury felt comfortable with.[11] It is not necessary, therefore, for us to determine whether, in fact, this conduct was improper. See *State* v. *Stevenson*, 269 Conn. 563, 582, 849 A.2d 626 (2004). We must examine the remaining remarks, however, to determine whether they were improper, and, if so, whether the totality of the impropriety deprived the defendant of a fair trial. Although we agree that the prosecutor did engage in instances of impropriety, we conclude that the defendant was not deprived of a fair trial.

"In examining claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 604, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007).

---

[11] More specifically, the prosecutor told the jury that it was within its province to let the defendant "walk out the door" if it felt "comfortable" doing so.

## A

The defendant argues that "the state repeatedly made two sets of arguments designed to appeal to the emotions and sympathy of the jury. First, the state referred on numerous occasions to the fact that the defendant and [the victim] had two children together and the effect of the defendant's alleged actions on those children . . . . Second, the state referred repeatedly to the fear allegedly experienced by [the victim], her subservient position with respect to the defendant and the 'cycle of violence' between them . . . ." (Citations omitted.) We are not persuaded that this amounted to impropriety.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [Our Supreme Court has] stated that such appeals should be avoided because they have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . No trial—civil or criminal—should be decided upon the basis of the jurors' emotions." (Citations omitted; internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 255, 833 A.2d 363 (2003). Nevertheless, "as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 641, 841 A.2d 181 (2004).

In this case, the victim recanted portions of her statement to the police, and the state presented expert testimony on the issue of battered woman's syndrome to explain the reasons that victims recant in situations in

which they are battered. As our Supreme Court has explained: "[E]xpert testimony concerning battered woman's syndrome has been accepted by many courts when the testimony was offered by a criminal defendant to bolster a claim of self-defense. . . . Such expert testimony has also been accepted if offered by the prosecution to explain the recantation of the complaining witness . . . and if offered to explain the victim's delay in reporting the abuse and remaining with the defendant after the abuse. (Citations omitted.) *State* v. *Borrelli,* 227 Conn. 153, 170, 629 A.2d 1105 (1993). Although the defendant argues that these issues were not relevant to the case against him, we conclude that they were relevant to help explain why the victim had recanted portions of her statement, as explained in the testimony by physician Evan Stark, the state's violence against women expert. Our review of the record reveals that the comments by the prosecutor regarding the victim's fear and the cycle of violence were supported by the evidence, as were the statements regarding the children.

### B

The defendant also claims that the state improperly vouched for the credibility of witnesses. Specifically, he argues that the state vouched for "[J] [and] Officers [Aaron] Trew and Michael DiBella by ridiculing any claim that their testimony was either mistaken or fabricated." The state argues that it never vouched for the credibility of these witnesses, but rather that it merely noted that the evidence did not support an inference that these witnesses had any motive to testify falsely. We agree with the state.

"[A] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore

because of the prosecutor's special position. . . .
Moreover, because the jury is aware that the prosecutor
has prepared and presented the case and consequently,
may have access to matters not in evidence . . . it is
likely to infer that such matters precipitated the per-
sonal opinions. . . . However, [i]t is not improper for
the prosecutor to comment upon the evidence pre-
sented at trial and to argue the inferences that the jurors
might draw therefrom . . . . We must give the jury the
credit of being able to differentiate between argument
on the evidence and attempts to persuade [it] to draw
inferences in the state's favor, on one hand, and
improper unsworn testimony, with the suggestion of
secret knowledge, on the other hand. The state's attor-
ney should not be put in the rhetorical straitjacket of
always using the passive voice, or continually emphasiz-
ing that he [or she] is simply saying I submit to you that
this is what the evidence shows, or the like." (Citation
omitted; internal quotation marks omitted.) *State* v. *Ste-
venson*, supra, 269 Conn. 583–84.

The defendant refers to two statements made by the
state during closing argument to support his claim that
the prosecutor improperly vouched for the credibility
of witnesses: "What motive did [they] have to come in
here and make that up?" and, "What possible bias or
motive did the police have for fabricating this?" We
conclude that these remarks were not improper.

Our Supreme Court has explained that "[i]t is not
improper for a prosecutor to remark on the motives
that a witness may have to lie, or not to lie, as the case
may be." (Internal quotation marks omitted.) *State* v.
*Stevenson*, supra, 269 Conn. 585; see also *State* v. *War-
holic*, 278 Conn. 354, 365, 897 A.2d 569 (2006) ("the
state may argue that a witness has no motive to lie").
The prosecutor's questions to the jury in this case, ask-
ing the jury to consider what motive these witnesses
had for lying, were not improper. Rather, the questions

properly called on the jury to use its common sense and experience to determine whether these witnesses were testifying truthfully. See *State* v. *Warholic*, supra, 365; *State* v. *Stevenson*, supra, 584–85.

## C

The defendant next claims that the prosecutor deliberately and improperly defied the orders of the court by seeking to elicit testimony concerning the intrusiveness of using a Sirchie rape kit, which elicitation repeatedly had been barred by the court because no rape kit was used in this case. Specifically, the defendant argues that "on a half-dozen occasions, the state sought to question witnesses about the details of a Sirchie rape kit, in contravention of the trial court's clear and express ruling barring such questions," and that this was improper. We agree that the prosecutor's repeated attempts to elicit such testimony were improper in light of the court's ruling that additional testimony on this issue would not be allowed.

During the direct testimony of Domenico A. Leuci, the gynecologist who had examined the victim at Stamford Hospital after the assault, the following colloquy took place without objection by the defendant:

"[The Prosecutor]: Okay. Did you do what's called a Sirchie kit?

"[The Witness]: I didn't.

"[The Prosecutor]: Do you know what that is?

"[The Witness]: Of course.

"[The Prosecutor]: Could you explain to the ladies and gentlemen of the jury what a Sirchie kit is?

"[The Witness]: It's essentially a state issued forensic kit in terms usually when there's a question of sexual abuse or a claim of sexual abuse.

"[The Prosecutor]: All right, and does that look for hairs, fibers, semen?

"[The Witness]: Correct, body fluids, hair.

"[The Prosecutor]: All right. And that wouldn't necessarily be left by a finger?

"[The Witness]: Not usually."

On cross-examination by defense counsel, the following colloquy related to a Sirchie kit occurred:

"[Defense Counsel]: The kit done in cases of sexual abuse—is that mandated by the state as to when it should be done or is it a physician's decision?

"[The Witness]: Basically—I can tell you when I would do the kit. I would do the kit if I was told definitively by a woman that there was, you know, a rape or sexual assault. I would do it if a police officer asked me. I would do it if one of my supervisors asked me to do it. At the time—

"[Defense Counsel]: But it's your decision?

"[The Witness]: I think it's my decision as well as others.

"[Defense Counsel]: But there's no state law saying you've got to do it?

"[The Witness]: Not that I'm aware of.

"[Defense Counsel]: Oh. And again, none was done in this case, correct?

"[The Witness]: Correct.

"[Defense Counsel]: Why not?

"[The Witness]: Well, as I said, in my judgment, you know, I didn't see any trauma or evidence that she had been penetrated. Her story to me was not consistent with the fact that she had definitively been penetrated.

And, likewise, I wasn't asked by anyone else to do it. . . .

"[Defense Counsel]: Okay. Did the police officer . . . ask you to do any specific test on [the victim]?

"[The Witness]: Not that I remember."

On redirect examination, the prosecutor sought to elicit further information on the intrusiveness of a Sirchie kit and how it is performed. Defense counsel objected, and the court sustained the objection, stating that it did not make a difference because such a kit was not performed in this case.

During the next day of trial, the prosecutor sought to elicit testimony from Trew on the use of a Sirchie kit, but defense counsel objected, and the court sustained the objection, stating that such testimony was "not relevant here because there is no testimony that a Sirchie kit was ever utilized in this case." This was the second time defense counsel objected to testimony concerning a Sirchie kit. The prosecutor attempted to explain the relevance of such testimony by arguing that the jury needed to know why a Sirchie kit was not requested in this case, but the court stated that it already had ruled.[12] The prosecutor then attempted to ask another question of Trew regarding when a Sirchie kit is done, and defense counsel offered his third objection to such testimony. The court ordered the testimony stricken and told the prosecutor to take an exception to the ruling.

Shortly thereafter, the prosecutor asked Trew if "the determination of whether or not bodily fluid was transferred [has] any influence on what you tell a doctor in terms of treatment?" Trew responded: "Yes. . . . Because . . . bodily fluid is the reason why we would

---

[12] We offer no opinion on whether the court should have allowed such testimony.

do a Sirchie kit." Defense counsel offered his fourth objection to such testimony, which the court, again, sustained.

Later that day, Conetta testified, and during direct examination, the prosecutor asked if "there was any mention to do any type of a rape kit" at the hospital. Defense counsel offered the fifth objection to such testimony, which the court sustained and instructed the prosecutor to "get it through [his] head" that such testimony would not be allowed.

The final instance of the prosecutor seeking to elicit testimony on a Sirchie kit was during the direct testimony of DiBella. The prosecutor asked DiBella if he had made any assessment as to what should be done when the victim got to the hospital, and he responded that he had not. The prosecutor continued by asking if he gave the victim any type of a Sirchie kit at that time, to which defense counsel offered a sixth objection to such questioning, which the court sustained.

The defendant argues that it is obvious that the prosecutor's repeated efforts to discuss a Sirchie kit were a deliberate attempt to "exaggerate the seriousness of the defendant's alleged conduct in the minds of the jurors." Although we think it is just as likely that the prosecutor, as he attempted to explain to the trial court, wanted the officers to explain why, in this case, they had not requested that Leuci perform a Sirchie kit on the victim, we nonetheless agree that counsel's repeated attempts to elicit such testimony were improper in light of the court's ruling that it would not be allowed.

D

Having concluded that the prosecutor committed impropriety when he: (1) told the jury that it was within its province to let the defendant "walk out the door" if it felt "comfortable" doing so and (2) attempted to

elicit additional testimony on the use of a Sirchie kit, despite the court's ruling that such additional testimony would not be allowed, we now turn to the ultimate question, which is "whether the trial as a whole was fundamentally unfair and [whether] the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 396.

To determine whether the defendant was deprived of his due process right to a fair trial, we must determine "whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following factors [set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)]: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 396.

1

The first factor we look to is whether the impropriety was invited by defense counsel. We conclude that the remarks of the prosecutor related to whether the jury felt comfortable letting the defendant "walk out the door" were not invited by defense counsel. Additionally, we conclude that although defense counsel extensively questioned Leuci about the use of a Sirchie kit during

cross-examination, the repeated attempts by the prosecutor to elicit additional testimony from other witnesses, despite the court's repeated rulings that further testimony would not be allowed, were not invited by defense counsel.

2

We next consider whether the impropriety was frequent or severe. Although the prosecutor repeatedly questioned witnesses regard the use of a Sirchie kit, we do not consider this improper questioning either frequent or severe. Questioning regarding the use of a Sirchie kit was allowed, without objection, during the direct examination and the cross-examination of Leuci. It was on redirect examination that defense counsel first objected to further questioning in this area, which objection the court sustained without further inquiry. When Trew testified, and the prosecutor initially asked him about the use of a Sirchie kit, the court sustained defense counsel's objection, but the prosecutor made two additional attempts to elicit such testimony from Trew, both of which also were not allowed. The prosecutor's final two attempts to elicit such testimony occurred during the testimony of Conetta, and they, too, faced objection by defense counsel. Both the prosecutor and defense counsel extensively questioned Leuci about the use of a Sirchie kit, on both direct and on cross-examination, without objection. The prosecutor's first attempt to elicit further information from Trew cannot be seen to be improper in light of the admission of the prior testimony. Nevertheless, following the court's sustaining of the defendant's first objection during Trew's direct examination, the remaining four attempts to elicit further testimony on this issue may have been improper, but we conclude that they were not frequent.

In terms of severity, we cannot say that the repeated attempts to elicit additional testimony on the use of

a Sirchie kit were severe because Leuci already had testified on the use of this kit during both direct and cross-examination without objection. The jury had been told what a Sirchie kit was, when it should be used and that a kit was not used in this case because the physician did not think it was necessary and the police had not requested that one be used. The improper attempts to elicit further information on the use of a Sirchie kit cannot be said to have been severe.

As to the prosecutor improperly telling the jury that it was within its province to let the defendant "walk out the door" if it felt "comfortable" doing so, we conclude that this line of argument also was neither frequent nor severe. The prosecutor's implication that the jury would be responsible for letting the defendant "walk out the door" clearly was an improper argument in that it asked jurors to consider extraneous matters when deliberating the defendant's guilt. See *State* v. *Whipper*, 258 Conn. 229, 271–72, 780 A.2d 53 (2001), overruled in part on other grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004). Nevertheless, this was an isolated argument, which quickly was the subject of an objection and a commendable curative instruction by the court.

3

Our next consideration is the centrality of the impropriety to the critical issues in the case and the strength of the state's case. The critical issue in this case was whether the defendant had committed the charged crimes, and this issue came down to a credibility contest, as is argued by the defendant. Because there were no eyewitnesses in this case, other than the victim and the defendant, the jury had to decide whether to believe the victim's statement to the police or her contrary trial testimony. The impropriety in this case, however, did not involve an attempt to enhance the credibility of

the victim. Thus, despite the improper nature of the prosecutor's remarks and his repeated attempts to elicit testimony on the use of a Sirchie kit after the court had ruled that such additional testimony would not be admitted, we conclude that the impropriety did not relate directly to the ultimate issue in this case.

4

Finally, we examine the sufficiency of the curative measures taken by the court. "[W]e have previously recognized that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 569, 710 A.2d 1348 (1998). Additionally, "[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." (Internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 258. We do recognize, however, that "a general instruction does not have the same curative effect as a charge directed at a specific impropriety, particularly when the [impropriety] has been more than an isolated occurrence." *State* v. *Ceballos*, 266 Conn. 364, 413, 832 A.2d 14 (2003).

At the end of the prosecutor's closing argument, almost immediately after he had argued improperly to the jury that it was within its province to let the defendant "walk out the door" if it felt "comfortable" doing so, the court instructed: "I want to admonish the jury at this time that it's not your function to feel comfortable or uncomfortable with regard to your decision. It's not your function to determine the possible consequences either with regard to the defendant or with regard to the victim or to the defendant's family or to the victim's family as to the decision you make. That is not your function. Your function is [to act as] fact finders. You're not here as crusaders. You're not here as admonishers.

You're there to determine what the facts are. Now, I will indicate that the last remarks of counsel by the state were not appropriate, and just ignore [them]." We conclude that the commendable and very direct admonishment of the prosecutor by the court cured any prejudicial effect that this improper argument may have had.

As to the prosecutor's improper attempts to elicit further testimony on the use of a Sirchie kit, although the court did not give a specific curative instruction with each improper question, it did sustain each objection made by the defendant. Additionally, in its final instructions to the jury, the court admonished the jury not to consider sympathy when determining the facts, to consider only the testimony and exhibits as evidence, not to consider excluded or stricken evidence and not to consider the arguments or comments of the attorneys as evidence. Finally, the court explained the presumption of innocence, the state's burden of proof and the fact that this burden must be met beyond a reasonable doubt.

As our Supreme Court often has directed, "[i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we [must] presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 762, 850 A.2d 199 (2004). In this case, there is no suggestion that the jury did not follow the court's general instructions.

After our application of the six *Williams* factors, we conclude that the instances of prosecutorial impropriety in this case did not deprive the defendant of his due process right to a fair trial.

E

The defendant also asserts that this court should invoke its supervisory authority over the administration

of justice to require a new trial because of the prosecutor's repeated attempts to elicit additional testimony concerning the use of a Sirchie kit, which the defendant argues, were in direct and flagrant violation of the clear orders of the trial court. The defendant requests that we apply a different standard of review to this claim because it involves the deliberate attempt by the prosecutor to circumvent clear rulings of the trial court. He requests that we employ our supervisory powers to vacate the judgment of conviction and order a new trial, which, he claims, would serve to deter this type of impropriety in the future. We decline the defendant's request.

"[W]e may invoke our inherent supervisory authority in cases in which prosecutorial [impropriety] is not so egregious as to implicate the defendant's . . . right to a fair trial . . . when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . We have cautioned, however, that [s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 405.

After carefully examining the instances in which the prosecutor improperly sought to elicit further testimony on the use of a Sirchie kit, we cannot say that this repeated attempt to elicit such testimony was so unduly offensive to the maintenance of a sound judicial process that reversal of the defendant's conviction is necessary. See *State* v. *Whipper*, supra, 258 Conn. 269. We are unable to conclude that the instances of impropriety in the present case were "so offensive to the sound administration of justice that only a new trial [could] effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v.

*Rizzo*, supra, 266 Conn. 251. Furthermore, it is undisputed that the particular prosecutor who tried this case is no longer engaged in the prosecution of criminal cases in Connecticut. Consequently, no exercise of supervisory authority to reverse the defendant's conviction could have any salutary effect on the manner in which this prosecutor might conduct future prosecutions. Therefore, we conclude that this case does not present an appropriate circumstance justifying the invocation of our supervisory authority.

The judgment is affirmed.

In this opinion FLYNN, C. J., concurred.

SCHALLER, J., dissenting. Although I agree with the majority's resolution of the claim of prosecutorial impropriety, I respectfully disagree with the resolution of the evidentiary claim by the defendant, Jose G. In my view, the defendant adequately preserved and presented his claim for our review under the circumstances of this case. I am persuaded that the admission of testimony about alleged incidents of uncharged sexual abuse was improper and harmful. As a result, I would reverse the judgment of the trial court and order a new trial.

I

I begin by addressing the procedural history of the defendant's evidentiary claim. The majority declines to review the defendant's claim on two grounds, namely, failure to preserve the issue at trial and failure to raise the issue in his main brief. As to the first ground, the majority correctly notes that defense counsel objected initially that the question was leading. The state argued in response that the evidence was offered to establish constancy of accusation. After the prosecutor rephrased the question, defense counsel objected again

by stating, "[t]hat's not specific enough. He gave her the dates." Defense counsel also argued that the prosecutor had "named every month and year until [the witness] said yes." After further argument, the court excused the jury and held a hearing on the admission of the testimony as constancy of accusation. Specifically, the court stated: "All right, voir dire. Constancy of accusation."

During the proceeding outside of the presence of the jury, the witness, J, testified that the victim had told her that the defendant sexually assaulted her two weeks before March 6, 2002. According to J, the victim also indicated that the defendant had sexually assaulted her six months before, in October or November, 2001. At the conclusion of the hearing, the court overruled the defendant's objection, stating: "All, right, but she cannot go into any specific indications, just that he forced her to have sex; that's what she told her on two occasions." In other words, the court admitted the challenged testimony into evidence as constancy of accusation. After ruling on the admission of the testimony as constancy of accusation, the court confused the situation by adding the ambiguous observation: "The reason I'm allowing this in is because of this claim that the testimony she gave here in court ought to be disbelieved because of the statement she made earlier," referring to the written statement the victim had made to the police, which had been admitted into evidence pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). This comment raised, for the first time, the possibility that the court may have had in mind admitting the challenged testimony as evidence of impeachment, rather than constancy of accusation.

As the majority notes, the defendant at no time objected to the proposed evidence as improper impeachment. The state, however, at no time offered

the evidence as impeachment evidence. From my review of the transcript, the court appeared to have understood that the basis for the offer was constancy, and both the prosecutor and the court addressed the offer as constancy of accusation.[1] Although it is also

---

[1] The following colloquy occurred during J's testimony:

"[The Prosecutor]: And let's go into—let's talk a little bit about your relationship with [the victim] and the defendant. We left off yesterday discussing a prior incident that they had had leading up to March 6 of 2002. Could you please tell the jury what that incident was all about?

"[Defense Counsel]: Objection.

"The Court: No, I'm allowing some of this testimony in on the basis of the alleged conflict between the statement of the victim in court and the statement of the victim out of court. But if you would be more specific as to what you're talking about, please.

"[The Prosecutor]: Okay.

* * *

"[The Prosecutor]: All right. So, were there between 1999 and March 6 of 2002, do you know of any other incidences with regard to their relationship?

"[The Witness]: Yes, I know them.

"[The Prosecutor]: Tell us, if you could.

"[Defense Counsel]: Objection, Your Honor.

"[The Prosecutor]: Well, if you remember the approximate month or date. I mean, obviously, this is a long time ago. If you could remember maybe the month or a time frame, a year, or something, or a period, spring, fall.

"[The Witness]: There was many, so, like—I knew because [the victim] always tell me everything, so, I knew what is going on between the relationship.

"[The Prosecutor]: Did she ever confide in you regarding sexual abuse?

"[Defense Counsel]: Objection, Your Honor, totally leading.

"[The Prosecutor]: Judge, it's constancy of accusation here.

"The Court: Pardon me?

"[The Prosecutor]: This is constancy of accusation. She denied all of it yesterday.

"The Court: Concerning a specific incident?

"[The Prosecutor]: Well, yes—

"The Court: That's what constancy of accusation is, as you understand.

"[The Prosecutor]: Yes, Your Honor.

"The Court: All right.

"[The Prosecutor]: All right, I'll rephrase. . . .

"[The Prosecutor]: Did she tell you about any specific dates, times, places, events, where there was sexual abuse?

"[The Witness]: Yes.

"[The Prosecutor]: Tell the jury what you know.

"[The Witness]: Before—

true that the defendant at no time objected to the testimony as improper constancy evidence, such an objection would have been futile in view of the court's ultimate ruling, after trial, that the testimony was admitted as impeachment evidence. In view of the procedural history, the defendant cannot be faulted for failing to

"The Court: Counsel, if this is for constancy of accusation, there is a limit set by the Supreme Court.

"[The Prosecutor]: Yes.

"The Court: Date, time and what she said.

"[The Prosecutor]: Can you remember any dates, or approximate?

"[The Witness]: It was 2000, around 2000.

"[The Prosecutor]: About a year after the incident that you testified to?

"[The Witness]: Not far away, like, six months or so before that.

"[The Prosecutor]: Okay, all right, so, about six months after the incident that you just testified about—

"[The Witness]: Before the—yeah. No, before the March, 2002.

"[The Prosecutor]: About six months before the [incident on] March 6 of 2002?

"[The Witness]: Yeah, yeah, yes.

"[The Prosecutor]: All right, so, we're talking about—I'm not a good mathematician. We're talking about November?

"[The Witness]: Around there.

"[The Prosecutor]: November, December?

"[The Witness]: Around October, November.

"[The Prosecutor]: Okay. What did she tell you about an incident that happened?

"[Defense Counsel]: Judge, objection. That's not specific enough. He gave her the dates.

"[The Prosecutor]: I'm not giving—

"[Defense Counsel]: He named every month and year until she said yes.

"The Court: Pardon me, counsel. I'm going to excuse the jury for a moment. . . . All right, voir dire. Constancy of accusation.

"[The Prosecutor]: Yes.

"The Court: As you know as a prosecutor . . . after a victim testifies concerning a specific act of assault, sexual assault, other people to whom she had complained about the sexual assault are allowed to testify. They're allowed to testify as to what she said about who attacked her and when the attack occurred.

"[The Prosecutor]: Yes.

"The Court: But that's it.

"[The Prosecutor]: Okay.

"The Court: Not a description of the occurrence.

"[The Prosecutor]: All right.

"The Court: And the reason I'm allowing it is because the last police officer stated in his testimony that the victim had complained to him about a sexual assault and that he referred it to the Norwalk police department."

preserve the evidentiary issue in the traditional manner. Because the evidence eventually was deemed by the court as impeachment evidence, rather than as constancy evidence, the defendant had no reason at the critical moment during the trial to object on the basis of impeachment. An objection based on constancy would not have accomplished any purpose in view of the ultimate ground for admission.

Under these circumstances, the defendant should not be penalized for failing to offer an objection on a ground that, at the time, had not been raised. "Practice Book § 288 [now § 60-5] provides in pertinent part that [w]henever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he desires it to go upon the record, before any discussion or argument is had. . . . [Our Supreme Court has] noted that [t]he purpose of the rule requiring that an exception be taken that distinctly states the objection and the grounds therefor is to alert the court to any claims of error while there is still an opportunity for correction. . . . This rule is essential to avoid trial by ambush [of the presiding judge and the opposing party]." (Citations omitted; internal quotation marks omitted.) *State* v. *Paulino*, 223 Conn. 461, 476, 613 A.2d 720 (1992). Put another way, "[a]ppellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel." (Internal quotation marks omitted.) *State* v. *Marshall*, 87 Conn. App. 592, 598, 867 A.2d 57, cert. denied, 273 Conn. 925, 871 A.2d 1032 (2005); see also *State* v. *Christiano*, 228 Conn. 456, 464, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994). A necessary corollary, however, to that general rule is that, given an unusual situation, this court may review such claims outside the scope of the

legal ground presented to the trial court. In my view, such a unique situation occurred in the present case.[2]

I conclude that it is sufficient under these circumstances that both the state and the trial court were put on notice that the defendant objected to the evidence. Additionally, I note that "[w]here . . . there is a question as to whether the claim was preserved, as long as it is clear from the record that the trial court effectively was alerted to a claim of potential error while there was still time for the court to act . . . the claim will be considered preserved." (Citation omitted; internal quotation marks omitted.) *State* v. *Francis D.*, 75 Conn. App. 1, 8–9, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003). Because the defendant objected to the evidence, and the court, sua sponte, changed, in its later articulation, the ruling for which it was admitted, I would conclude that the defendant's claim was preserved properly.

I now turn to the second ground offered by the majority to decline to address the merits of the defendant's evidentiary claim, namely, the defendant's failure to raise the issue in his main appellate brief. The following background information is necessary to explain my disagreement with the conclusions reached by my colleagues. In his main appellate brief, the defendant claimed that the court improperly admitted the testimony of J and Stamford police Officer Sandra Conetta as constancy of accusation testimony. The state argued in its brief that this claim was not reviewable because the record indicated that the court admitted the testimony for impeachment and not as constancy of accusation testimony.

---

[2] I do not mean to suggest that I am in favor of a departure from the general rule limiting appellate review of evidentiary questions to the ground presented to the trial judge. It is my view, however, that the facts and circumstances of this case warrant a departure from the well traveled path, although I believe such a detour should be the rare exception.

In his reply brief, the defendant conceded that the court ultimately deemed that it had admitted the testimony for impeachment purposes. He argued, nonetheless, that the evidence was admitted improperly because it constituted extrinsic evidence on a collateral issue and that it was more prejudicial than probative. On the issue of reviewability, the defendant argued that he did not have the opportunity to respond to the issue of impeachment until the court issued an articulation in January, 2006, after his main appellate brief was filed. The state argued that the defendant's attempts to raise this issue in his reply brief are improper and, as such, we should not review this claim.

On May 9, 2005, the defendant filed a motion for articulation, requesting the court to articulate the basis for admitting the challenged testimony, as well as other evidence including expert testimony related to battered woman's syndrome, which the state had proffered at trial.[3] The court denied that motion, and, on June 2, 2005, the defendant filed a motion for review with this court. On July 19, 2005, we granted the motion as to the ruling admitting expert testimony, but denied it as to the other requests.

On September 22, 2005, the defendant filed a request pursuant to Practice Book § 64-1, seeking a signed transcript or memorandum of decision from the trial court with respect to, inter alia, the court's ruling to admit evidence related to claims of uncharged misconduct against him. The defendant submitted his main appellate brief to this court on November 21, 2005. On January 3, 2006, the trial court issued a memorandum of decision on the admission of evidence related to claims of uncharged misconduct against the defendant. In that

---

[3] The state had presented testimony by an expert on violence against women, Evan Stark, who testified, inter alia, that it is quite common when battering is involved that victims of abuse will recant statements that they made in the excitation of the moment of abuse.

decision, the court asserted that the evidence was admitted as impeachment evidence of the victim's trial testimony.[4] The state filed its appellate brief on May 10, 2006.

At oral argument before this court, the state argued that the reasoning for the trial court's ruling was not ambiguous and that the defendant should have briefed the impeachment issue in his main appellate brief. Without abandoning its position that the claim is not reviewable, the state requested permission to present a full written brief on the substantive merits of the issue. On January 16, 2007, we granted the state's request to file a supplemental brief, which the state filed on January 31, 2007.

I am mindful of the well established principle that "arguments cannot be raised for the first time in a reply brief. . . . Claims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *State* v. *Howard F.*, 86 Conn. App. 702, 708, 862 A.2d 331 (2004), cert. denied, 273 Conn. 924, 871 A.2d 1032 (2005).

Here, the defendant's argument in his reply brief does not present an entirely new claim of error. As noted previously, it is my position that the defendant properly preserved the issue under the circumstances at trial by

---

[4] As the court stated, "[b]ecause the [victim's] trial testimony and the *Whelan* statement were in such total conflict, and because the jury had to decide which version or portions of which version to credit, the state was permitted to introduce additional evidence of out-of-court statements allegedly made by the victim in order to impeach her trial testimony."

objecting to the testimony at each juncture, and he set forth in his main appellate brief the claim that the evidence was admitted improperly. My review of the record supports the view that the defendant, understandably, was misled by the court's perplexing ruling on the admissibility of the evidence during trial and was not apprised adequately of the specific ground on which the court relied until the court issued its January 3, 2006 articulation. When the state responded to the defendant's main appellate brief on May 10, 2006, the state had the benefit of the court's decision, which the defendant did not. Also, the state requested the opportunity to respond to the argument raised in the defendant's reply, and we granted the state leave to file a supplemental brief. As such, the state has not been denied the opportunity to present its written argument to us with respect to the merits of the claim.

Exceptional circumstances may persuade us to consider an issue raised for the first time in a reply brief. See *State* v. *McIver*, 201 Conn. 559, 563, 518 A.2d 1368 (1986) (permitting appellant to raise issue for first time in reply brief because record adequately supported claim defendant had been deprived of fundamental constitutional right and fair trial); see also *Curry* v. *Burns*, 225 Conn. 782, 789 n.2, 626 A.2d 719 (1993) (permitting appellant in reply brief to join amicus curiae request to overrule prior case law); *37 Huntington Street, H, LLC* v. *Hartford*, 62 Conn. App. 586, 597 n.17, 772 A.2d 633 (addressing issue raised in reply brief where appellant had no earlier opportunity to respond to issues raised in briefs filed by amici curiae), cert. denied, 256 Conn. 914, 772 A.2d 1127 (2001). These are exceptional circumstances. As I will discuss, the issue presented is of sufficient magnitude to warrant reversal of the judgment. The strength of the defendant's claim in light of the confusing procedural history of this case constitutes circumstances that, in fairness, demand our

review of the merits of the claim. I conclude that the defendant's claim is properly before this court.

## II

I now turn to the merits of the defendant's claim, which is based on the court's ultimate ruling that the evidence was admitted for the purpose of impeachment. In its January 3, 2006 memorandum of decision, the court explained that because the victim's trial testimony and prior *Whelan* statement were in total conflict, the jury had to decide which version or portions of which version to credit. The court effectively permitted the state to present testimony from two witnesses, J, a friend of the victim, and Conetta, the Stamford police officer, that the victim told each of them that the defendant had sexually abused her on previous occasions in order to impeach the victim's trial testimony and to bolster the credibility of her *Whelan* statement. The court, therefore, admitted extrinsic evidence of the victim's prior inconsistent statements to impeach her trial testimony.[5]

"Where a party seeks to impeach a witness by using extrinsic evidence, certain standards must be met. The inconsistent statement must be relevant and of such a kind as would affect the witness' credibility, and, generally, a foundation for introducing the statement should be laid at the time of [the examination] of the witness." (Internal quotation marks omitted.) *State* v. *Ward*, 83 Conn. App. 377, 393, 849 A.2d 860, cert. denied, 271 Conn. 902, 859 A.2d 566 (2004). "[*T*]*he foundation for introducing a prior inconsistent statement is laid by asking the witness . . . whether* [*the witness*] *made the statement and alerting* [*the witness*] *to the time and place at which it was made. . . .* Where the witness denies having made the statement or is unable

---

[5] A party may impeach his own witness using prior inconsistent statements. See *State* v. *Williams*, 204 Conn. 523, 530, 529 A.2d 653 (1987).

to recall having done so, extrinsic evidence may be admitted to show it was made." (Citations omitted; emphasis added.) *State* v. *Butler*, 207 Conn. 619, 626, 543 A.2d 270 (1988).

Although such a foundation should be established, we have no inflexible rule regarding the necessity of calling the attention of a witness to her alleged prior inconsistent statements before introducing extrinsic evidence tending to impeach her. *State* v. *Saia*, 172 Conn. 37, 46, 372 A.2d 144 (1976). Our rules of evidence provide that "[i]f a prior inconsistent statement made by a witness is not shown to or if the contents of the statement are not disclosed to the witness at the time the witness testifies, extrinsic evidence of the statement is inadmissible, *except in the discretion of the court.*" (Emphasis added.) Conn. Code Evid. § 6-10 (c); see *State* v. *Daniels*, 83 Conn. App. 210, 215, 848 A.2d 1235, cert. denied, 270 Conn. 913, 853 A.2d 528 (2004).

"As a general rule, extrinsic evidence of a prior inconsistent statement may not be admitted to impeach the testimony of a witness on a collateral matter. . . . Thus . . . a witness' answer regarding a collateral matter is conclusive and cannot be contradicted later by extrinsic evidence. . . . Extrinsic evidence of a prior inconsistent statement may be admitted, however, to impeach a witness' testimony on a *noncollateral* matter. . . . A matter is not collateral if it is relevant to a material issue in the case apart from its tendency to contradict the witness. . . . The determination of whether a matter is relevant to a material issue or is collateral generally rests within the sound discretion of the trial court." (Citations omitted; emphasis in original.) *State* v. *Valentine*, 240 Conn. 395, 403, 692 A.2d 727 (1997). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the trial court's rulings on evidentiary matters." (Internal quotation marks omitted.) *State* v. *Hall*, 66

Conn. App. 740, 757–58, 786 A.2d 466 (2001), cert. denied, 259 Conn. 906, 789 A.2d 996 (2002).

During her trial testimony, the victim indicated that the defendant had not abused her in the past.[6] The victim, however, neither was asked nor testified specifically with regard to the statements she had made to J about prior sexual assaults, and the state did not pursue questioning related to her statements to Conetta.[7] See *State v. Richardson*, 214 Conn. 752, 764, 574 A.2d 182 (1990) ("[s]tatements from which a possible inference of inconsistency may be drawn are insufficient for the purpose of impeachment"). Prior to offering extrinsic evidence of the statements through J and Conetta, therefore, the state did not elicit testimony from the victim as to whether she had actually made statements to them, and the victim was never afforded the opportunity to deny or to explain having made the proffered statements to them.[8] Compare *State v. Valentine*, supra, 240 Conn. 399–405 (finding extrinsic evidence to

[6] During the direct examination of the victim, the following testimony was elicited:
"[The Prosecutor]: Did he ever force himself on you sexually?
"[Defense Counsel]: Objection, Your Honor.
"[The Witness]: No."

[7] During the direct examination of the victim, the state asked, "[d]id you at all mention [to the police] that you had been raped two weeks earlier . . . ." After the court sustained a defense objection, the state asked, "[d]o you recall stating that you had been sexually assaulted earlier, some two weeks earlier, and you were told to get looked at either by the doctor or to go to the Norwalk police department . . . ."
This question triggered a hearing outside the presence of the jury on the issue of whether to admit the victim's prior statement to the police under *Whelan*. When the victim's testimony resumed, however, the state did not pursue this questioning, and no response was ever elicited from the victim.

[8] During the state's questioning of the victim, the state did impeach her trial testimony with her *Whelan* statement. Relative to her written statement, the state asked, "Because it says in the statement that you indicated to the police physical, mental, emotional, sexual abuse, did you tell the police that?" The victim responded, "No." The state did not ask the victim specifically about her statements to Conetta on the way back from the hospital.

impeach witness' prior inconsistent statement should have been admitted after witness specifically denied making statement related to central issue in case on cross-examination). If, for example, the victim had not denied making the statements during her trial testimony, but rather explained the context of the statements, extrinsic evidence of her statements would have been cumulative. See *State* v. *Bermudez*, 95 Conn. App. 577, 585, 897 A.2d 661 (2006) ("the appellate courts in this state have established that when a witness admits to making a prior inconsistent statement, additional evidence of the inconsistency is merely cumulative"); see also Conn. Code Evid. § 6-10 (c) ("if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court").

By failing to question the victim adequately about the statements, the state failed to lay a proper foundation for introducing extrinsic evidence to show that the statements had been made. Even in the absence of a foundation, however, it could still be within the discretion of the trial court to admit an impeaching statement. *State* v. *Williams*, 204 Conn. 523, 534, 529 A.2d 653 (1987). Such a failure does not, in itself, end our inquiry.

In determining whether the court exercised its discretion improperly by admitting the testimony, a pertinent question before us is whether the testimony related to a noncollateral matter, that is, whether the testimony was relevant to a material issue in the case apart from its tendency to contradict the victim. See *State* v. *Valentine*, supra, 240 Conn. 403. "Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 641, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

In its January 3, 2006 memorandum of decision, the court made no specific finding that the evidence was relevant for any purpose other than impeachment and no specific finding with regard to the prejudicial impact of admitting the testimony. For the first time, in its supplemental brief,[9] the state argues that the evidence was relevant to matters other than impeachment because it indicated the defendant's prior acts of violence toward the victim, which demonstrates the manifestation of battered woman's syndrome relative to the victim. In other words, the state argues that the victim's recantation at trial was the result of battered woman's syndrome and that, apart from impeachment, it was entitled to present evidence of the defendant's prior acts of uncharged misconduct against the victim to substantiate that she suffered from the affliction. See *State* v. *Vega*, 259 Conn. 374, 396–99, 788 A.2d 1221 (concluding acts of defendant's prior misconduct admissible as evidence of escalating pattern of abuse commonly understood to be experienced by battered women), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

Although I view the issue through the lens of impeachment, I am mindful not to engage in a myopic application of impeachment principles without regard to the rules of evidence as a whole. In determining whether the offered evidence is collateral, the state's relevance argument relates to allegations of the defendant's acts of prior uncharged misconduct, which it has raised for the first time in its supplemental brief. Whether the evidence was admitted properly, therefore, requires further analysis.

---

[9] At trial, the state argued that the evidence was admissible as constancy of accusation testimony. In its main appellate brief and at oral argument, the state argued that the defendant's argument was without merit because the court admitted the evidence for the purpose of impeachment.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"[An appellate court's] standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) Id., 396–97.

"The trial court's discretion to admit other crimes evidence imports something more than leeway in decision-making. . . . Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . When assessing

the admissibility of other crimes evidence, the application of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification. *The problem is thus one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Sierra*, 213 Conn. 422, 435, 568 A.2d 448 (1990).

In the present case, the state's argument with respect to the admissibility of the testimony is limited to the relevance prong of the analysis.[10] In essence, the state asserts that the evidence of two specific instances of the defendant's prior acts of sexual abuse toward the victim, offered exclusively through indirect testimony of other witnesses, demonstrated that the victim had suffered from battered woman's syndrome and was, therefore, per se admissible. It is the responsibility of the trial court, however, to go beyond the mere application of a mechanical test in determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility. See id.

With regard to the relevance prong of the analysis, the court did not determine that the prior acts were sufficient to constitute a course of conduct. See *State* v. *Vega*, supra, 259 Conn. 398 ("[t]he course of conduct— beginning with minor assault, building to the carving of the name 'Joey' on the victim's chest, and escalating

---

[10] In the impeachment context, even if the evidence is relevant, it is still subject to a balancing test. See 1 C. McCormick, Evidence (6th Ed. 2006) § 49, p. 238.

to the horrific events [to which the victim was subjected] was properly offered to prove a system of activity on the part of the defendant"). Moreover, the record reveals that although the court recognized that the evidence was prejudicial,[11] beyond a simple assertion that the testimony was proper for impeachment, we are unable to infer that the court considered the prejudicial effect of the evidence against its probative nature before making a ruling on the admissibility of the evidence.[12] See *State* v. *Nunes*, 260 Conn. 649, 690, 800 A.2d 1160 (2002) ("in order for this test to be satisfied, a reviewing court must be able to infer from the entire record that the trial court considered the prejudicial effect of the evidence against its probative nature before making a ruling"). It is apparent from a review of the transcript that the issue of prior uncharged misconduct was not presented adequately to the court, and that the court did not perform the necessary balancing test to weigh the actual relevance of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury would probably be roused. See *State* v. *Sierra*, supra, 213 Conn. 436.

Further, in analyzing whether the probative value of the statements outweighed their prejudicial effect, I am particularly troubled that the state did not take advantage of other evidence available to it, namely, the opportunity to confront the victim directly with the statements.[13] With respect to the probative value of the

---

[11] Recognizing the potential prejudicial impact, the court specifically limited the testimony that the victim had stated that the defendant forced her to have sex with him on two occasions, but did not permit testimony as to the specifics.

[12] For example, the court gave no specific instruction to the jury after the testimony on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact. Compare *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994).

[13] The state made some effort to question the victim about the specific instances of prior sexual abuse, to which it received little response, but the

evidence for impeachment purposes, the state argues that the court properly admitted the testimony because it was relevant to the credibility of the victim's trial testimony in comparison to her *Whelan* statement. As the court explained in its January 3, 2006 memorandum of decision, the jury was presented with two conflicting statements from a key witness and was faced with the responsibility of deciding which version of events or portions thereof to credit. The prior *Whelan* statement, however, did not refer directly to the two prior incidents of sexual abuse.[14] Thus, although the extrinsic impeachment evidence may have served to discredit the victim's trial testimony, it served no function to corroborate the *Whelan* statement.

The central question before the jury was the relative credibility of the victim's *Whelan* statement versus her trial testimony. In light of the fact that the extrinsic evidence had no real bearing on the *Whelan* statement, and to the extent that the impeachment evidence was presented exclusively through extrinsic sources without affording the victim the opportunity to deny or to explain the statements at trial, it likely distracted the jury from the main issue. *State* v. *West*, supra, 274 Conn. 642 ("The general rule precluding the use of extrinsic evidence for impeachment purposes . . . admits of no exception merely because the witness is a key witness. Indeed, the primary reason for the exclusion of such extrinsic evidence, namely, its potential for provoking a minitrial that is likely to distract the jury from the

state never pursued any questioning of her related to whether she had made such claims to the impeachment witnesses.

[14] In the *Whelan* statement, which was read to the jury, the victim stated that "[the defendant] and I have had a lot of domestic problems during our last four years together, including two prior incidents where [the defendant] was arrested for hitting me. . . . Because of the physical, mental and sexual abuse I have received recently, I have decided to break off the relationship . . . ." This is the only part of the statement that implies that the prior sexual assaults had occurred.

main issues . . . is equally compelling regardless of whether the witness is important." [Citations omitted.]); see also *State* v. *Santiago*, 224 Conn. 325, 340, 618 A.2d 32 (1992) ("[e]vidence should be excluded as unduly prejudicial . . . where it may create distracting side issues" [internal quotation marks omitted]).

Essentially, the court admitted hearsay testimony related to highly prejudicial acts of prior uncharged misconduct,[15] without affording the declarant, who was available to testify, the opportunity to explain having made the statements. Her explanation could well have been critical to the jury's decision whether to believe or to disbelieve her trial testimony. I conclude that, because the state did not lay a proper foundation to admit the extrinsic evidence[16] and because the court did not conduct a balancing test prior to admitting the evidence, the court exercised its discretion improperly by admitting extrinsic evidence of the victim's prior inconsistent statements to impeach her trial testimony.

Although I conclude that the court improperly admitted the evidence, the question remains whether the impropriety was harmful. "When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error." (Internal quotation marks omitted.) *State* v. *Sierra*, supra, 213 Conn. 436. Our Supreme Court recently stated that "a nonconstitutional error is harmless when an appellate court has a fair

---

[15] "The inherent danger in allowing evidence of the defendant's prior bad acts is the tendency of the jury to believe that the defendant had a predisposition to commit the crime with which he is now charged." *State* v. *Santiago*, supra, 224 Conn. 340.

[16] Ordinarily, the issue of lack of proper foundation must be raised by the defendant before the trial court. See *State* v. *Teel*, 42 Conn. App. 500, 504, 681 A.2d 974, cert. denied, 239 Conn. 921, 682 A.2d 1012 (1996). Here, however, the state's failure to lay a proper foundation pertains to the prejudicial effect of admitting the prior inconsistent statements through extrinsic sources, without first confronting the victim with the statements.

assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (en banc); see also *State* v. *Michael A.*, 99 Conn. App. 251, 270, 913 A.2d 1081 (2007). "One factor to be considered in determining whether an improper ruling on evidence is a harmless error is whether the testimony was cumulative . . . ." (Internal quotation marks omitted.) *State* v. *Vega*, 48 Conn. App. 178, 192, 709 A.2d 28 (1998). "It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." (Internal quotation marks omitted.) *State* v. *Christian*, 267 Conn. 710, 742, 841 A.2d 1158 (2004).

Here, the state argues that evidence that the defendant committed a sexual assault on the victim two weeks prior to the charged incident was introduced also through the testimony of a second police officer, Aaron Trew, and the defendant has not raised any claim of error on appeal regarding the admission of that evidence. The state argues, therefore, that any error is harmless. I disagree.

During Trew's testimony, over defense objection,[17] the officer testified that on the night of the incident, the victim stated that she had been sexually assaulted by the defendant two weeks prior. Conetta testified, however, in significantly greater detail with regard to this prior assault. Specifically, Conetta testified that the victim had told the officer that in the prior incident, the defendant had broken into her home, forced himself

---

[17] Simply because the defendant has not raised the issue on appeal does not merit the conclusion that the evidence was validly admitted. Compare *State* v. *Calderon*, 82 Conn. App. 315, 326, 844 A.2d 866 ("the record reveals that the substance of what the defendant claims was improperly admitted testimony merely was cumulative of other *validly admitted evidence*" [emphasis added]), cert. denied, 270 Conn. 905, 853 A.2d 523, cert. denied, 543 U.S. 982, 125 S. Ct. 487, 160 L. Ed. 2d 361 (2004).

on her sexually and "in a sense raped her." Conetta further testified that the victim had indicated that she believed it was too late to do anything about the incident. Moreover, the state presented *no other evidence* related to the first incident of sexual assault occurring in October or November, 2001, about which J testified. The improperly admitted evidence, therefore, was not cumulative.

Because the credibility of the victim's testimony was the central issue in this case, I conclude that the defendant met his burden of showing that the verdict was substantially affected by the improper evidentiary ruling because he has demonstrated that the testimony of the impeachment witnesses, without the victim having had the opportunity to explain her statements, presented a side issue that so distracted the jury as to influence its decision.

Accordingly, I would reverse the judgment of conviction and remand the case for a new trial.